Good morning, may it please the Court. This case is here from the grant of a summary judgment finding that there was probable cause to arrest, incarcerate and prosecute the plaintiff for seven years until he was acquitted in a criminal trial. The case is a section 1983 wrongful detention case and it's involving a robbery homicide that was committed by several black males and witnessed to some extent by seven Hispanic persons. After plaintiff was identified in photo lineups and arrested, it became known that virtually every fact about the plaintiff that was discovered pointed away from him as the perpetrator. This included the fact that his nickname was Boomer, the perpetrator was known to be named Boom. This included the fact that the perpetrator was known to have a phone number associated with him. Not only did plaintiff not have a phone or that phone number, but that phone number continued being pinged by the detectives after the plaintiff was arrested. When Moorer was arrested, which was just 15 hours after the murder, he was seen not to have a scratch on him. No injuries whatsoever. However, there had been a life and death struggle in the apartment where the murders occurred and the victims, two of the victims had bruising and marks all over him. Moorer had nothing. The only specific characteristic descriptor of the perpetrator other than being black male was that this person was a huge or fat or 230 pound according to one witness or 250 pound according to another witness person. Mr. Moorer was not that person. He weighed roughly 185 pounds. Well, it's not at all uncommon for eyewitnesses to guesstimate height and weight incorrectly. What's important here is that we've got six eyewitness identifications establishing probable cause. And the case law suggests that even one is enough. So we've got six here agreeing that Mr. Moorer is the guy. Sure. And there's a knee jerk reaction to say, OK, there's all these eyewitness identifications and therefore there's plenty of probable cause. But in the case of each individual eyewitness person, there were substantial reasons to doubt the reliability because they either said things that they couldn't have seen because it was physically impossible or they said things about the perpetrator that was impossible because they admitted that his face was completely covered or they were coached. In one example, they were coached by the detectives to pick him out, according to that witness, to pick him out of the photo array. What are we supposed to do, Mr. Fox, though, with the grand jury? So what we do with the grand jury is that the evidence that was given to them was misinformed. Much of it was omitted. And the ASAs that prosecuted the case didn't have a lot of the information at their disposal that should have been presented to the grand jury. So, for example, when I said that Mr. Moore didn't have a scratch on him when he was arrested despite this life and death struggle, that information wasn't known to them and so it wasn't made available to the grand jury. But are we putting a beyond a reasonable doubt standard in instead of the probable cause standard at that juncture? Because clearly, obviously, he won a trial. Right, right. But you know what? There was a lot of evidence. There was a lot of evidence that wasn't placed in front of the grand jury that the prosecutors didn't know about. Another example was the detectives went and interviewed for alibi witnesses. Mr. Moore had said, I was at a family party with my entire family. My girlfriend was there. I was with my girlfriend the entire time. The detectives went and talked to two sisters. The detectives said those were the only witnesses to the prosecutors. But Mr. Moore had pleaded with the detectives to talk to his girlfriend. The detectives went to the house, were met by the girlfriend at the front door, knew that it was his girlfriend and yet didn't talk to her. And that was notwithstanding that the two sisters said he was at this party but they said there were holes in it because the two sisters said, well, we didn't see him 100% of the time at the party because I went upstairs sometimes to look after my children or something like that. So there was also the issue with the cell phone, which was not made known to the prosecutors. The cell phone, which was the most tangible piece, most important piece of tangible evidence in the case because that was the information that had the name of the perpetrator plus the phone number. Plus, according to Edwin Ramos, the perpetrator had been phoning and texting his brother when it was his brother's cell phone for the week prior. That piece of evidence was missing. And the prosecutors couldn't know it was missing because the detectives never inventoried it. And it was never reported in a report that was missing. And so this was, again, some of the most important information in the trial. And there was more. There was the initial – there was more information that wasn't known. The initial perpetrator was identified with the nickname Zeebo. That came through over a call to the – a 911 call from the hospital. That information never made its way to the prosecutor. Mr. Fox, forgive me. I'd like to go back, if you would. Sure. As Chief Judge Sykes noted, the prosecutor re-interviewed six eyewitnesses as well as two alibi witnesses and reviewed the police reports before finding probable cause for the rest. Why wouldn't that determination by the prosecutor, based on the prosecutor's independent assessment of the witnesses, break any causal connection between the defendants and the detention? Because when you look at the facts about each individual witness, the prosecutor did not know. And I'll go through them. Delia Rivera, for example, she stated in statements and at the lineup that, yes, Moore was the one that had the gun that shot the victim. Ms. Rivera was never in the apartment. She didn't know who shot the victim. And that's undisputed. And the prosecutor didn't know that. Alinda Kindeland, another witness, said in statements before the lineup, she said, I didn't see the perpetrator.  I didn't see anybody with a gun. At the courts of the lineup, she's quoted in the live lineup, she's quoted as saying, yes, he was the one with the gun. The prosecutor didn't know what was being said at the live lineup. Jacqueline Hernandez, another witness, she could barely give a description of the perpetrator, only saying he was a black male. Then she admitted to the detectives, as well as us in deposition, that his entire face was covered by a mask the entire time. So that couldn't be a reliable, not only could that not be a reliable identification, but she was asked to look at a photo ID, a photo lineup, I should say, at a time that it was impossible for her to have looked at one because of the timeline that went on. She was interviewed within five minutes of Edwin Ramos giving information about Mr. Moore, or Boom, I should say, because he didn't have Mr. Moore. And even the detectives say that wouldn't be time enough to make a photo array, assemble a photo array. Miguel, the witness Miguel, he was the one that said in statements to prosecutors before the lineups that he didn't see who shot the gun. At the physical lineup, in which the prosecutors weren't present, he said, yes, that's the one who shot the gun. But he had said the prosecutors weren't there to see that. And Edwin's testimony, Edwin Ramos, who was the main witness because he was the one that initiated somehow getting Moore into this photo array, which isn't known how it happened because there's no report of it. And the detectives all claim they don't remember how it happened. But Edward Ramos testified that he was coached to pick Moore out of the lineup. And what his testimony was, was that he was shown a notebook full of photos. The detectives don't maintain notebooks full of photos. But in any case, he testified he was given a notebook full of photos. He picked one out. The detectives then went into another room. The detectives then came back with that photo in a photo array and said, so is this the guy you picked out? He says, yeah. And then they said, OK, sign under here and give it back to us. So he was coached to pick out Mr. Moore from a photo array. The prosecutors didn't have all this information. And so that's why you want to say they have a lot of eyewitnesses. But for each instance, every instance, there's a very real credibility and reliability issue. Mr. Fox, with regard to Mr. Moore's history here, were there a series of bail motions that were brought to try to when this evidence started coming out with potential weaknesses, were there a series of bail motions that were brought to attempt to address his incarceration status prior to trial? No, there weren't a series of bail motions that I'm aware of, I should say, in the criminal proceeding. And in fact, and then what happened even later on during the discovery process in the criminal proceeding, about a year later, the DNA evidence came back. Mr. Moore was excluded by virtue of the DNA evidence from being at the scene. So when you combine that with all the other evidence that they had, but the prosecutors didn't have all this other evidence, it was really plain at that point that there shouldn't have been probable cause to continue on with that proceeding. No DNA, all the factors about him were inconsistent with what was known about the perpetrator, and the witness all had reliability problems. And regarding the court's opinion and reliability, the court didn't analyze the case in terms of reliability, which it should because that's the touchstone of probable cause. What it did was it continually said the plaintiffs had to show coercion or it had to show that there was trickery going on, and we didn't have to show that, although we did with Edwin Ramos. We have to show that there was unreliability, and we did that in several different ways. And one thing that the court also did was the court deemed as admitted, and it shouldn't have, but the court deemed as admitted all of the individual witness identifications in the Rule 56 Statement of Facts. The court deemed them admitted because we denied them based upon reliability and credibility. When the witness said in the Statement of Facts, yes, Alina identified Mr. Moore out of the lineup, we denied it saying she couldn't have reliably and credibly done that because she said things that were impossible for her to know and inconsistent with other things. We said that for each and every witness. The court said that's not a valid denial, and then they deemed it all admitted. That deeming of that admission permeated the court's entire opinion so that it failed to look at the reliability of the witnesses throughout the opinion because of that. And a similar thing happened with regard to the expert witnesses. We had expert witnesses. The expert testimony was so skewed in plaintiff's favor that the defendants didn't even use their own experts, and we cited to the experts' opinions that we got from the deposition testimony. That's how skewed it was in plaintiff's favor. But based on the constitutional standards for admissibility, not the test for probable cause. So the court admitted that the opinions were admissible, and the court discussed that. They were in a footnote. They said it was admissible because the experts did more than talk about, quote-unquote, a bottom line. There was no— No, no, I'm not talking about the experts, the admissibility of the experts' opinion. I'm talking about the standards that you're arguing this case under. You seem to be filtering the probable cause inquiry through the Neal v. Biggers admissibility standard having to do with the reliability and suggestiveness of ID techniques. When the two things are separate, we said so in Phillips, we don't apply those suggestive ID standards to a probable cause determination. Especially in a hindsight civil suit for damages for false arrest or unlawful detention. And I agree. The Phillips case is troubling because of that, and other things that it said. For example, it also said that the only way you can judge the reliability of an eyewitness is if he has a grudge against the perpetrator. But obviously that can't be true because there's other ways that a witness might be unreliable. For example, he might be talking about something that was impossible for him to see. And other cases post-Phillips, like Hart v. Menina, make reference to the 14th Amendment standards. So there is some inconsistency in the Seventh Circuit about using the 14th Amendment that comes after the Phillips case. And the fact of the matter is we're talking about reliability. And the Phillips case was— Actually, no. Probable cause is a reasonableness standard. If there's reasonable cause to support the arrests, then there's no Fourth Amendment violation. And so we don't do a robust reliability analysis in assessing whether there's probable cause to support an arrest or detention. Well, I beg to disagree. In the Woods case, the court has said—the Seventh Circuit has said the touchstone of probable cause is reliability in the context of probable cause. And if you have evidence that's wholly unreliable and obviously unreliable, then it can't be relied upon to establish probable cause. What do we do in a case such as this, where you have Edwin, Hernandez, Miguel telling the detectives they were 100% certain of their identification? And when Walter was—you know, who hadn't previously viewed the photo array, when he was called to view an in-person lineup, he said he was 80% sure, and the detective treated that as a negative identification. Well, there was no evidence that there was 100% certainty by the witnesses. There was no contemporaneous reporting of it anywhere that there was 100% confidence in it. So all I can say is that's just not in the evidence, that they were 100%. The 80% thing you mentioned about Walter wasn't in the evidence. And I see that my time is up, so if it's okay with the Court, I will reserve the rest of my time. Thank you. Mr. Enriquez. May it please the Court. A grand jury indicted Moorer when seven eyewitnesses identified him as an assailant in the shooting. The sole claim at issue in this appeal is his Fourth Amendment claim against 12 detectives and the city for unlawful pretrial detention pursuant to legal process. The district court's grant of summary judgment in favor of the detectives and the city was correct for three independent reasons. First, prosecutors, not the detectives, were responsible for Moorer's being detained following the grand jury's indictment. Second, the detectives had probable cause as a matter of law. And third, the detectives, at a minimum, were entitled to qualified immunity. First, prosecutors, not the detectives, were responsible for Moorer's being detained following the indictment. Moorer contends that he was unlawfully detained for the period of about seven years between his indictment and the criminal trial. The indictment enabled the continued prosecution and detention of him until his criminal trial. Prosecutors have sole authority to seek grand jury indictments and otherwise prosecute criminal defendants. Police officers, including detectives, lack any authority to seek indictments or otherwise prosecute arrestees. Thus, whether probable cause exists to seek an indictment, and if an indictment is issued, whether to continue prosecuting a criminal defendant and to seek his continued detention are decisions that can only be made by prosecutors, not police officers. Of course, prosecutors make those decisions based on the evidence, and typically they depend on police officers to inform them of the evidence. Thus, as this court observed in the Colbert case, while the state's attorney, not the police, prosecutes a criminal action, it is conceivable that a wrongful arrest could be the first step towards a malicious prosecution, but where a grand jury has returned an indictment, the chain of causation is broken by the indictment absent either pressure or influence exerted by the police officers or knowing misstatements by the officers to the prosecutor. Here, Moore does not even contend that any detective pressured or exerted influence on any prosecutor, much less identify evidence to that effect. And while Moore asserts that a jury could be free to believe that the detectives made knowing misstatements to prosecutors, he identifies no evidence that any detective made any misstatement, let alone any knowing misstatement, to any prosecutor. Thus, under Colbert, the grand jury's indictment of Moore, having been sought and pursued by prosecutors, not the detectives, broke any causal chain stemming from Moore's arrest and therefore precludes his unlawful detention claim. In his reply brief, Moore nonetheless says that various facts not found in the records that the detectives gave prosecutors were exculpatory, and he asserts that the detectives either did not or likely did not communicate those facts to the prosecutors or that it could be inferred that they did not commute them to the prosecutors orally. Today, his counsel simply says they didn't communicate them to the prosecutors. But a claim that police officers withheld exculpatory evidence from prosecutors is a Brady claim, which is not a Fourth Amendment claim but is a due process claim that lies only where the criminal defendant was convicted at a criminal trial that was unfair. Here, Moore was not convicted at his criminal trial and thus does not have a Brady claim. Regardless, Moore has no evidence that any exculpatory evidence was withheld from prosecutors. All 12 defendant detectives were deposed, yet Moore does not identify any statement in any deposition to the effect that detectives did not tell prosecutors about any of the facts, including facts- Was there any evidence known to law enforcement that the cell phone contained evidence exculpatory? Absolutely not. There's no evidence at all that the cell phone contained any exculpatory evidence. Indeed, Moore did not even- So as I said, all 12 detectives were deposed, yet Moore has identified not a single bit of evidence in any of those depositions about what the detectives either told the prosecutors or did not tell the prosecutors about this case. Indeed, Moore did not even ask any deponent what the detectives- He didn't even ask them, any of the detectives, what they did or did not tell prosecutors. And notably, the record does not include the deposition of even one prosecutor who had any role in Moore's criminal case before the grand jury issued its indictment or during the first six years that he was detained after the indictment. Moore asserts that a jury- Is there any evidence that Mr. Moore was on the defendant's radar as a possible suspect prior to his identification by Edwin from among the persons with a nickname that is similar to Boomer? Absolutely not, Your Honor. The first inkling that they had about Moore was when Edwin, the brother of the murder victim, said that he had seen- he recognized Moore during the incident at the apartment in which the shooting occurred that he knew that- he thought his name was Boom, and then the detectives went to their software using nicknames and learned- and that software produced over a hundred names of people with the nickname Boom or variations of Boom, then showed Edwin that compendium of photographs, and out of all those photographs, and Moore admits that there were more than a hundred of them, Edwin identified Moore from his photograph as one of the assailants. So it's a known assailant identified by an eyewitness within hours of the shooting. Within a very few hours of the shooting, that's correct. And then, of course, after Edwin identified Moore from his photograph, the officers created a photo array in which Moore's photograph and the photographs of five other people were put- five other people were put on a- five of the other people who were actually identified from- were put on a photo array and shown to Edwin. Edwin then identified Moore again, and then four other people of the other- four of the other people who were present were shown that same photo array independently. They were separated in rooms. Each was shown the same photo array. All of them identified Moore from the photo in the photo array. And then, of course, at that point, the- Moore was eventually arrested based on a request to pick him up, and when he came in, there was a- independent lineups, in-person lineups, and eventually all seven of the eyewitnesses independently saw him in an independent lineup and picked him out of the independent lineup. And it was- is Mr. Enriquez- I'm sorry, Mr. Enriquez. Is Mr. Fox correct when he states that Edwin Hernandez and Miguel did not tell the detectives, or that that's not in the evidence, that they told the detectives, that they were 100% certain of their identification? The record is actually that one of the officer- one of the officers who interviewed several of the witnesses interviewed the ones who said they were 100% sure. His report says the interviewees, the eyewitnesses whom he interviewed, did say 100% sure. Other detectives interviewed other of the eyewitnesses. They didn't say the percentage of confidence that any of the others had, but there's no evidence that any of the others had less than full confidence in their eyewitness identification. Well, other than Walter, who said he was only 80% sure. Well, I'm talking- actually, I'm sorry, Your Honor, I should have qualified that. The photo arrays- five people looked at the photo arrays. All of them recognized Moorer, and eventually Walter, who had not seen the photo arrays, saw an in-person lineup. He was the only one of the seven who saw the in-person lineup who said that he was less than 100% sure. He said he was 80% sure. None of the others expressed any uncertainty at all, no degree of uncertainty about whether or not they recognized him in the in-person lineup. So again, the grand jury's indictment of Moorer, since no evidence from any detective indicates that any of them failed to tell any prosecutor about any fact exculpatory or not, and there was not even a single prosecutor who was deposed in this case, and so none of them provided any evidence that they were not told any of the facts that Mr. Fox says that prosecutors did not know. He's simply incorrect in asserting that there were things the prosecutor did not know. He has the burden of proving his case on summary judgment. He has to at least deduce evidence on every one of the elements of his case. He doesn't have any evidence at all that prosecutors were- that any information was withheld, nor, of course, does he have any evidence that any of the detectives lied to any of the prosecutors, and, of course, there's no evidence at all that there was any impermissible influence or exerted over any of the prosecutors. Under the Colbert case, the chain of causation from the arrest was broken by the grand jury indictment. It was the responsibility- any responsibility for Moorer's detention after the grand jury indictment was the responsibility of the prosecutors, not the police officers in this case. I see I have very little time, but I do want to make it clear that there's also, not surprisingly, with seven eyewitness identifications in the case, probable cause existed as a matter of law. Mr. Fox tries to indicate that some of those identifications were less than reliable. They're not. He says that there were certain things that were impossible for witnesses to know that they testified to, but that doesn't undermine their reliability. The key thing about those witnesses is that they testified to things that they saw Moorer doing, but they didn't have any doubt. They didn't say- there was no question about whether or not they identified him from his face, and the mask clearly came down during the incident for all of them except one of them. We acknowledge that Jacqueline Hernandez, who sits in the car with Walter for part of the time, never saw the face of Mr. Moorer. All the others testified that this mask came down, they saw his face, and so there was no question about Mr. Fox's statement about that some witnesses testified to things they couldn't know is simply incorrect if there are no further questions. Thank you. We ask that the court affirm the judgment of the district court. Thank you. Thank you. Mr. Fox, I believe your time had expired. You may have an additional two minutes to rebut. Thank you. With regard to the question of whether there were reports that said that the witnesses were 100% certain, they made a statement of fact at number 68 saying that these three witnesses were 100% certain. They didn't cite to any reports. They cited to depositions that were taken years later. It's not in any report. Detective Gonzalez did all the live lineups. He did a separate report for each one. There's not an indication of percentage confidence in any one of those reports, and that's all in our paperwork. As far as Edwin knowing the perpetrator before and being the witness, Edwin was wrong about everything that he said about the perpetrator. Edwin said the perpetrator's name was Boom, but it wasn't Boom. Mr. Moore's name is Boomer. Edwin had the phone number that was associated with Boom. That phone number was not Mr. Moore's phone, and, in fact, that phone continued being pinged subsequently months later after the arrest. Edwin said for something that he knew that Mr. Moore weighed 250 pounds. Mr. Moore weighed about 180. The real Mr. Moore weighed about 185 pounds, and we can reasonably infer that if Edwin really knew him, then his assessment of the weight would probably be accurate, but Mr. Moore did not have that weight, so everything he said was incorrect. Further, with regard to counsel's rendition of how the identification took place and they looked up nicknames in the computer, went to software, and they produced 100 names, that entire thing is a fiction. Every detective that testified, and I did all the depositions, every detective that testified did not remember how it happened. They did not remember how it happened. There is no report about how it happened anywhere. Detective Gonzalez testified about it in a suppression hearing at the criminal trial, and in a very limited sense. He didn't give all the specifics. He said, oh, we went to a computer and did a nickname search. When he was asked about it, and that's all he said at the suppression hearing, not about getting 100 names and Edwin looking through them all. When he was asked about it at his deposition, he said he didn't really know about it. He didn't know who did the search. He didn't know about Edwin, about how many of the names it produced, and he didn't know what Edwin did in connection with that. And, in fact, we did computer searches, and this is all in our additional facts. We did computer searches for this computer printout that they allegedly did. It doesn't exist. As far as Consul saying that there's – I'll just give one example now. As far as Consul saying – if I could just – You can finish up. Okay. Saying that there was no misstatements by any of the detectives to the ASA. I just told you about one, and it's in the record. It's even in their brief. Mr. McDermott said there were just – only the two sisters were the only alibi witnesses when they knew there were many more witnesses because Mr. Moore had told them, and it's quoted in my brief that he said there were many more witnesses other than the two sisters. So that alone is one of many misstatements. Thank you. All right. Thank you very much. Our thanks to all counsel. The case is taken under advisement, and the court will take a brief recess before we call the third case this morning.